**In re Thomas Matthew NOWATZKE, Debtor.**

**Laura Jean Nowatzke, Debtor.**

**Monroe Bank & Trust, Plaintiff,**

v.

**Thomas Matthew Nowatzke and Laura Jean Nowatzke, Defendants.**

**Bankruptcy Nos. 01–51724–R, 01–51725–R.**
**Adversary No. 01–4834.**

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Dec. 21, 2004.

Sandra A. Hazlett, George W. Kelsey, Ann Arbor, MI, for Debtors.

*Opinion Regarding Defendant's Motion for Attorney Fees and Costs*

STEVEN RHODES, Chief Judge.

This matter is before the Court on Laura Nowatzke's motion for attorney fees of $75,625 [1] and expenses of $6,440.28 incurred in defending this adversary proceeding. Monroe Bank & Trust filed an objection. The Court conducted a hearing on October 25, 2004, and took the matter under advisement.

---

1. The motion originally requested $82,285 in attorney fees. However, Nowatzke reduced the fee request to $75,625 at the hearing.

## I.

On September 17, 2001, MBT filed this complaint to determine the dischargeability of debt pursuant to 11 U.S.C. § 523(a)(2)(A) and (B). Following trial on September 23, 2003, the Court issued an opinion concluding that the debt was non-dischargeable under § 523(a)(2)(B). The Court concluded, in part, that in financial statements that the Nowatzkes had submitted to MBT, they failed to disclose financial obligations that they owed to Great Dane Ltd. Partnership exceeding $7.5 million. The Court further concluded that MBT reasonably relied upon the Nowatzkes' financial statements in deciding whether to extend credit and that the Nowatzkes intended to deceive MBT.

On March 17, 2004, the Court issued an order vacating the judgment and granting the defendants' motion for a new trial.

Following the new trial, the Court issued an opinion and order determining the debt to be dischargeable and dismissing the adversary proceeding. The Court's decision was based primarily on the testimony of Scot Laskey, a former MBT employee. He testified that he was pressured by MBT and its attorney, Barry Savage, to give false and misleading testimony in the first trial and was led to believe that a forbearance agreement presented to him by Barry Savage a few days before the trial represented new debt that the Nowatzkes had not previously disclosed to MBT.

## II.

Nowatzke asserts that she is entitled to attorney fees under § 523(d) because the action was filed under § 523(a)(2), the obligation concerned a consumer debt, the debt was found to be non-dischargeable, the complaint was not substantially justified, and there are no special circumstances which would make the imposition of fees unjust.

Nowatzke contends that the debt in question was consumer debt because one of the seven notes, for $230,000, was for the purpose of a down-payment on a house. Although the other six notes were not consumer debt, Nowatzke contends that her legal fees would have been the same whether only the home loan note was being contested or all of the notes were at issue.

Alternatively, Nowatzke contends that if the Court determines that the debt is not consumer debt, the Court has the inherent power to award fees and costs because MBT perpetrated a fraud on the Court by pressuring Scot Laskey to corroborate MBT's false representations under oath. MBT contends that Nowatzke has not established that the $230,000 note was a consumer debt. MBT asserts that the note is labeled "Commercial Promissory Note," and that the stated purpose on the note is "Buy House." MBT contends that the note does not indicate that the house was to be a personal residence for the Nowatzkes.

MBT asserts that there are special circumstances which would make an award of attorney fees unjust. MBT contends that the debtors have not acted honestly toward MBT because part of the proceeds from the $230,000 note was clearly used for commercial purposes.

## III.

11 U.S.C. § 523(d) provides:

If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs

and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d).

Nowatzke contends that the debt was a consumer debt because the purpose for one of the seven notes was for a down-payment on a house.

■ "Consumer debt" is defined as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8).

> Section 101(8) requires that the court consider the purpose for which the debt was incurred, and where the debt was incurred for more than one purpose, deems that the primary purpose of the debt will determine its nature. *See* 2 Collier on Bankruptcy ¶ 101.08, at 101–47 (Lawrence P. King ed., 15th ed. rev. 2004) ("If a debt is incurred partly for business purposes and partly for personal, family or household purposes, the term 'primarily' in the definition suggests that whether the debt is a 'consumer debt' should depend upon which purpose predominates. Presumably, this determination would normally turn on the purpose for which most of the funds were obtained." (footnote omitted)).

*In re Stewart,* 215 B.R. 456, 465 (10th Cir. BAP 1997).

MBT's complaint sought a determination that the debts evidenced by the following notes were nondischargeable:

| Note Date | Amount |
|---|---|
| 7/20/00 | $ 100,000 |
| 8/31/00 | $ 90,000 |
| 3/15/01 | $ 272,700 |
| 5/10/01 | $ 230,000 |
| 3/01/01 | $ 190,000 |
| 1/16/01 | $ 195,000 |
| 6/23/01 | $ 350,000 |
| Total | $ 1,427,700 |

(See Complaint, Ex. A–G.)

■ Even if the Court concludes that the $230,000 note was a consumer debt, that note only represents 16% of the total debt. It is undisputed that the remainder of the debt was for business purposes. Accordingly, the Court concludes that the debt was not primarily for a personal, family or household purpose and thus is not a consumer debt.

## IV.

■ Although the Court does not find the requirements for § 523(d) satisfied, the Court has the inherent power to grant attorney fees. In *Chambers v. NASCO,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), the Court "explor[ed] the scope of the inherent power of a federal court to sanction a litigant for bad-faith conduct." *Id.* at 35, 111 S.Ct. at 2128. The Court observed that:

> [A] court may assess attorney's fees when a party has " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258–259, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (quoting *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974)). *See also Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, n. 4, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) (per curiam). In this regard, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party, *Universal Oil Products Co. v. Root Refining Co.,* 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946), as it may when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order," *Hutto v. Finney,* 437 U.S. 678, 689, n. 14, 98

S.Ct. 2565, 57 L.Ed.2d 522 (1978). The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of "vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy."

*Id.* at 45–46, 111 S.Ct. at 2133 (footnote omitted).

Laskey testified at the new trial that when Barry Savage was preparing him to testify in the first trial, Savage repeatedly tried to convince Laskey that the Nowatzkes had not disclosed all of their debt to the bank. When Laskey attempted to disagree with Savage, Savage got aggressive with him and told him to grow up. (See Tr. of July 8, 2004 Reh'g at 21–23.) Laskey testified that he told Ron LaBeau from MBT about his conversations with Savage and that he was not going to lie. Laskey testified that in a meeting with Savage, after LaBeau relayed that conversation to Savage, Savage began to yell at Laskey and stated that the judge knew that the Nowatzkes were liars and cheats and that Laskey needed to grow up and not forget where his paycheck was coming from. (See Tr. at 24–26.)

Laskey further testified that later that evening he received a phone call from Savage. When he got on the phone, Savage began yelling at him for talking to Ron LaBeau. Savage told Laskey that he was to review the bank notes word for word. Laskey told Savage that he was on his way out the door for his daughter's school orientation. Laskey testified that Savage told him, "By God, you better be there. Don't you go, you stay there, and you better go over this stuff word for word." (See Tr. at 27.) Laskey testified that Savage made it very clear that Laskey could not go to his daughter's orientation. Further, Laskey testified that when Savage called him back two hours later he told Laskey that if he talked to LaBeau again about this issue he would be fired. (See Tr. at 27.)

Laskey testified that Savage came to see him before the trial and reminded him that because Laskey had a drug problem he was on very thin ice. Savage also reminded him about the meetings they had and that if Laskey did not go along with the testimony, i.e. that MBT did not know about the additional debt, he would be fired. (See Tr. at 30–31.)

Laskey further testified that he met with Savage and Rick Kinsey three days before the trial at a restaurant to discuss the testimony. Laskey testified that Savage told him that Laskey had fallen in love with Tom Nowatzke's celebrity status and Laura Nowatzke's fancy dresses, that Laskey was making loans to them left and right, and that Laskey had to accept the fact that they were bad loans. (See Tr. at 34–35.) Laskey testified that he told Savage that was not how it was and that he would not testify to that. Laskey stated that Savage got upset and walked out. He returned 30 seconds later and told Laskey that he was coming to Laskey's house the following day to straighten the matter out. (See Tr. at 35.) Laskey stated that he refused to have Savage come to his house, so he agreed to meet him the following day at the library. They ended up going over to the bank where Savage presented the forbearance agreement to Laskey and told him that it represented additional debt not previously disclosed to the bank. (See Tr. at 36.) This caused Laskey to testify at the first trial that if he had known about the debt represented in the forbearance agreement, he would not have approved the loans. However, Laskey later discovered that the Nowatzkes had disclosed the debt to the bank and that he had been

misled by Savage and MBT. This led to the Nowatzkes' motion for retrial and the Court's reversal of the nondischargeability judgment.

The Court must conclude that MBT and its attorney, Barry Savage, demonstrated bad faith in pressuring Scot Laskey to give false testimony and in misleading him to testify that the forbearance agreement represented additional debt. Savage's treatment of Laskey was reprehensible. It resulted in an abuse of court processes. Laskey's testimony at the new trial was uncontradicted; neither MBT nor Barry Savage made any attempt to refute Laskey's testimony regarding Savage's conduct. Moreover the Court found Laskey's testimony credible.

Accordingly, the Court concludes that it is appropriate to award attorney fees and costs in this matter. MBT has not objected to the amount of fees sought by Nowatzke. The Court has reviewed the fee request and concludes that it is reasonable in the circumstances and should be granted.

The Court will enter an appropriate order.